**GULF CITY FISHERIES, INC., Libelant,**

v.

**Daniel SLAY and THE DANLYN, an oil screw vessel, her engines, hull, tackle, and appurtenances thereof, Respondents,**

**Martin T. Brinkman, Intervenor.**

**No. 3047.**

United States District Court
S. D. Alabama, S. D.
Sept. 21, 1965.

M. A. Marsal, Ross Diamond, Jr., Diamond & Lattof, Mobile, Ala., for libelant.

John H. Tappan, Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for respondent Slay.

Keener T. Blackmarr, Mobile, Ala., for intervenor, Brinkman.

DANIEL HOLCOMBE THOMAS, District Judge.

This libel in rem and in personam is brought by the libelant to recover for alleged necessaries furnished to the vessel, Danlyn, and to recover the balance due on a note signed by the respondent, Daniel Slay. The respondent by cross-libel seeks damages from the libelant for the detention of the vessel and the value of furnishings removed from said vessel. The intervenor claims that he is the record title-holder of the Danlyn.

### FINDINGS OF FACT

1. Gulf City Fisheries, Inc., a Mississippi corporation doing business in Pascagoula, is engaged in the seafood business and operates shrimp boats. They also contract with shrimp boat operators for the operation of shrimp boats in the catching and purchasing of shrimp and other seafoods. Mr. Daniel Slay is the purported owner of the oil screw vessel, the Danlyn. Mr. Martin T. Brinkman, a marine engineer, also claims an interest in the Danlyn.

2. In August 1961, Mr. Charles E. Graham, President of Gulf City, and Mr. Slay entered into an agreement whereby Gulf City was to sell Mr. Slay marine equipment valued at $3,610.00. Mr. Slay paid $2,400.00 by check and signed a $1,210.00 note for the balance. The note was dated October 12, 1961, and was payable in six months. The note called for 6% interest and a 10% attorney's fee. The note was not paid when it became due in April 1962, and has not been paid to date.

3. Mr. Slay began operating the Danlyn as a shrimp boat in January 1962. This operation only lasted for two months, because of an injury to Mr. Slay in March 1962. Mr. Slay began negotiations with Mr. Graham at this time to have Gulf City operate the vessel. In April 1962, the parties entered into an oral agreement. This agreement was to the effect that the crew of the vessel would get 40% of the profits and Mr. Slay was to be paid 60%. Gulf City was to be paid a 5% operational fee. It is disputed whether Gulf City's 5% was to come from Mr. Slay's 60% or from 100%, before a split was made. According to Mr. Graham, Gulf City was to get 5% from 100%, and the remaining 95% was to be split 60% and 40%, the latter amount going to the crew. Mr. Slay stated that Gulf City was to get its 5% out of his 60%.

4. The Danlyn made its first trip for Gulf City on April 28, 1962. When the vessel returned from each trip, the catch was weighed and a trip sheet was prepared by Gulf City, which made all disbursements. The costs and all bills incurred by the Danlyn were entered on each trip sheet. In all, the Danlyn made thirteen trips from April 28, 1962, to October 22, 1962, under the agreement. The vessel continually needed repairs; and as a result of this and other expenses, Mr. Slay never recorded a profit. The deficit of each trip was carried over to the next trip. Mr. Slay and Mr. Graham were both discouraged because of the unending trouble, so the operation was terminated around October 27, 1962. The trouble that brought the matter to a head concerned the repair bill of the Danlyn's reduction gear. Mr. Graham stated that he would have continued the operation if Mr. Slay had paid the repair bill, but Mr. Slay refused to do so.

5. The evidence is in dispute as to the number of times Mr. Slay demanded the return of his vessel. It is without dispute, however, that Mr. Slay wrote Mr. Graham on November 28, 1962, and January 31, 1963, demanding the return of the Danlyn. There was also testimony that Mr. Slay orally demanded the return of the vessel around July 4, 1962, and after at least two trips were completed. At these times, Mr. Slay tendered part payment in cash and the remainder on a note to Gulf City. Mr. Graham continually refused to return the vessel until the advancements to the Danlyn were paid.

6. In November 1962, Mr. Graham informed Mr. Slay that the indebtedness of the boat was $2,059.36. However, after various credits were given Mr. Slay, the total amount of advancements to the Danlyn was $1,715.05. Mr. Edmund A. Wilson, Mr. Slay's attorney, in a letter to Mr. Graham dated January 31, 1963, stated that according to an audit Mr. Slay had run, Gulf City was indebted to Mr. Slay in the amount of $1,764.99. This audit took Gulf City's 5% commission from Mr. Slay's 60% and not from 100% of the profits.

7. Mr. Graham kept the vessel from October 22, 1962, until December 1963, at Gulf City in Pascagoula. Mr. Graham did not charge any dockage fee for the first five months. However, Mr. Graham wrote Mr. Slay and informed him that starting March 1, 1963, a $5.00 per day dockage fee would be charged.

8. In December 1963, the vessel was moved, without Mr. Slay's consent or knowledge, from Pascagoula to Bayou la Batre, Alabama. This suit was then filed and the vessel was turned over to Captain Dayton Graham, as custodian, at a dockage fee of $3.50 per day.

9. The testimony established the fact that some equipment and parts were taken from the Danlyn while the vessel was in the libelant's custody. Mr. Slay testified that the missing equipment and parts amount to $1,849.75. Mr. Brinkman substantiated Mr. Slay's testimony in this respect. Mr. Graham and Captain Oscar Nelson testified that only a few minor inexpensive parts are missing.

10. Mr. Brinkman had expressed an interest in buying the Danlyn in the fall of 1962. He inspected the vessel on various occasions in Pascagoula. Mr.

Slay and Mr. Brinkman agreed on the terms of the sale, and Mr. Slay signed a "Bill of Sale of Enrolled Vessel" on March 13, 1963. However, Mr. Slay claims that there was no consideration for the sale. Mr. Slay never got the $5,000 note and the Dog River property of Mr. Brinkman in return for the vessel. Mr. Brinkman went to Pascagoula to obtain the Danlyn, but Mr. Graham refused to release the vessel unless Gulf City was paid the approximately $3,000.-00 the boat owed, and a $1,200 note. Mr. Brinkman offered to pay the $3,000.-00, but he would not pay the $1,200.00 note.

11. Mr. Slay testified that under the oral operational agreement, Mr. Graham was not to let the vessel get over $500.00 or $600.00 in debt.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction in this matter under Title 28 U.S.C. §§ 1332 and 1333.

2. The libelant had a valid maritime lien on the vessel; therefore, Gulf City was entitled to possession until its bill had been paid. To have the vessel released, Mr. Slay was required to make an adequate tender. Although Mr. Slay did demand the return of the vessel on several occasions, he failed to make an adequate tender. In the absence of an adequate tender, a lienor has the right of possession. The City of Miami, 1 Cir., 265 F. 427; Martin v. Amiga Mia, D.C., 80 F.Supp. 42.

3. Although Mr. Graham stated that he would charge Mr. Slay $5.00 a day as a dockage fee, the Court finds that this is excessive. The custodian of the vessel under seizure seeks a $3.50 per day fee, and the Court also finds that this is excessive. The Court finds that $3.00 a day is a reasonable fee for a custodian of a vessel of this type and size.

4. The Court finds that the libelant is entitled to recover $1,715.05 for necessaries furnished to the vessel. The Court further finds that the libelant is entitled to recover $1,195.00 plus interest and attorney's fee on the note signed by the respondent on October 21, 1961. The libelant is also entitled to recover $825.00 as a dockage fee. The libelant kept the vessel for 275 days at $3.00 per day.

5. The Court finds that the respondent is entitled to a deduction of $1,849.75 for Gulf City's negligence in allowing equipment and parts to be removed from the vessel while in its custody and control. The libelant did not use reasonable care in protecting the vessel's equipment.

6. The $1,715.05 debt is erased by the $1,849.75 deduction, with $134.70 in deductions remaining. The $134.70 deduction subtracted from the $825.00 dockage fee leaves $690.30.

7. The net amount due the libelant is $690.30, plus the sum of $1,195.00, with interest and attorney's fee, due on the note signed by the respondent on October 21, 1961.

Decree to be entered accordingly.